# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **LAWRENCE WILLIAMS** | * | **CIVIL ACTION NO.   13-0478** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **ANTONIO JOHNSON** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Upon reference of the District Court pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned Magistrate Judge held an evidentiary hearing on July 22, 2014, for purposes of entertaining testimony and evidence on all remaining issues in the case.  Because the above-captioned matter and *Burke v. Cox*, Civ. Action No. 13-2154 (W.D. La.) share common questions of law and fact, the undersigned joined the two cases for hearing only.  Fed.R.Civ.P. 42(a)(1).  At the conclusion of the presentation of evidence by all parties on the issue of administrative exhaustion, and again at the close of the case, defendant moved for judgment on partial findings (incorrectly styled as a "motion for judgment as a matter of law") [doc. # 56]. More recently, on September 17, 2014, plaintiff filed a motion for transfer to a non-smoking facility, together with a request for compensatory damages.  [doc. # 60].

For reasons set forth below, it is recommended that the motion for judgment on partial findings [doc. # 56] be DENIED; it is further recommended that plaintiff Lawrence Williams' claims be DISMISSED, without prejudice, for failure to exhaust administrative remedies; it is further recommended that plaintiff's motion for transfer and for compensatory damages [doc. # 60] be DENIED.

**<u>Background</u>**

On March 5, 2013, Lawrence Williams, an inmate in the custody of Louisiana's
Department of Public Safety and Corrections ("LDOC"), filed the instant pro se civil rights
complaint under 42 U.S.C. § 1983 against Antonio Johnson, a high-ranking officer at the
Madison Parish Detention Center ("MPDC") where Williams is currently housed.  Williams
complains that he is exposed to unreasonable levels of environmental/second hand tobacco
smoke ("ETS") at the MPDC facility.  He sued Antonio Johnson requesting an immediate
transfer to a non-smoking facility, plus compensatory damages for injury(ies) sustained as a
result of the ETS exposure.

On August 5, 2013, this court completed its initial screening pursuant to 28 U.S.C. §§
1915 and 1915A, and ordered service on Johnson, via U.S. Marshal.  (Aug. 5, 2014, Mem. Order
[doc. # 20]).  Johnson answered plaintiff's complaint on November 18, 2013.  [doc. # 27].  After
the close of discovery, Johnson filed a motion for summary judgment [doc. # 30].  On April 30,
2014, the undersigned recommended that the motion be denied and that the matter be referred for
an evidentiary hearing.  (April 30, 2014, Report and Recommendation ("R&R") [doc. # 40]).  On
May 22, 2014, the District Court adopted the R&R and referred the matter to the undersigned to
hold an evidentiary hearing.  (May 22, 2014, Judgment [doc. # 42]).

In accordance with the District Court's directive, the undersigned scheduled the matter
for an evidentiary hearing, representing "**a complete hearing of all witnesses and evidence to
be presented by all parties of record**."  (May 29, 2014, Order [doc. # 43]).  The evidentiary
hearing pursuant to 28 U.S.C. § 636(b)(1)(B) and *Flowers v. Phelps*, 956 F.2d 488 (5th
Cir.1992), *modified on other grounds*, 964 F.2d 400 (5th Cir.1992), was held on July 22, 2014.

2

The matter is now before the court.

## Hearing Testimony and Evidence

At the hearing, the court heard testimony from plaintiffs, Lawrence Williams and Gilbert Burke; plaintiffs' witnesses:  Michael Gordon, Toby Matt, Zenas Fruge', and Courtney Plumbar; and defense witnesses:  Sheriff Larry Cox, Antonio Johnson, and Gerald McCloud.  The court also received into evidence the following exhibits,[1]

**Defense Exh.  1)**    MPDC Administrate Remedy Procedure

**2)**    DOC Smoking Policy

**3)**    Blank Inmate Grievance Forms

**4)**    Hand-written Grievances Signed by Lawrence Williams

**5)**    Voluntary Statement of Lester Turpin, dated January 22, 2014

**6)**    Commissary Records of Gilbert Burke

**Plaintiff Exh. 8)**    Inmate Grievance Forms Signed by Gilbert Burke

**Defense Exh.  9)**    DVDs of Surveillance Video from the MPDC

**Plaintiff Exh. 10)**    Hand-Drawn Depiction of Dormitory

**Defense Exh. 12)**    Deposition Transcript of Lawrence Williams

**I.    Hearing Testimony**

1)    <u>Lawrence Williams</u>

Lawrence Williams is presently incarcerated at the MPDC, where he has remained for the past 27 months.  He arrived at the MPDC on May 25, 2012, and was placed in C Dormitory.

---

[1]  Defense proposed Exhibit No. 7 included Gilbert Burke's medical records, to which Burke objected because they were incomplete.  The court sustained the objection.  Plaintiff Exhibit No. 11 was withdrawn.

Williams asked for grievance forms, but never received any.  Accordingly, he wrote his grievance on a piece of paper, which is reflected as Exhibit 4, and submitted it.  The document represents his initial grievance regarding smoking at the MPDC.  He made duplicate originals. He placed one of the documents in an envelope marked Madison Parish Screening Officer, and deposited that where the officer sits in the dormitory.  However, he never received a response thereafter.  Thus, he wrote another grievance, dated 10/6/2012, and placed it in the "flap," in the dormitory.  Again, however, he received no response.  Accordingly, Williams submitted another grievance in December, but without any response.

Williams did not tell the guards that he was not receiving responses to his submissions. However, he did write to the acting warden, Major Antonio Johnson, via his uncle.  He mailed a letter inside of a letter to his uncle, so his uncle could forward it to Major Johnson.  His uncle forwarded the letter to Johnson on January 16, 2013.  That same date, Williams was "called out." During this meeting, Johnson talked with Williams about secondhand smoke, education, and earning good time.  Johnson told Williams that there were no non-smoking dormitories in the State of Louisiana.  Williams returned to his dormitory and started sending ARPs.  However, he never received a response.

Williams thought that he sent a letter to the sheriff, but was unsure.  He could not remember whether he wrote the sheriff.  Nonetheless, Williams conceded that he was familiar with the grievance forms.

Williams has not smoked since he was a teenager.  He was housed in "B" dormitory at the time of the hearing.  He reported to the nurse that he has been having headaches and sinus problems.  However, he has not seen a physician for his exposure to tobacco smoke.  Williams

conceded that his claim was for future health damages, but he would like to receive monetary compensation.  The hearing was the first time that Williams had met fellow plaintiff, Gilbert Burke.

2)    <u>Gilbert Burke</u>

At the time of the hearing, Burke had been incarcerated at the MPDC for two and one-half years.  He was convicted of identity theft.  He was aware of the grievance process, and recognized Exhibit 3 as an inmate grievance form.  Burke acknowledged that inmates were supposed to place completed grievance forms in the mailbox.  However, because the grievances were not being received, the inmates started handing them to the deputies.

Burke understood that if he was not satisfied with the initial step of the grievance process, then the next step was to go to the warden.  Burke explained that he never received a response to his initial grievance.  In fact, he only once ever received a response to a grievance, but it did not pertain to cigarettes.

Burke completed about ten grievances regarding smoking in the jail.  He deposited perhaps half of them in the box.  He gave one to a deputy.  He conceded, however, that he never proceeded to step two with any of his grievances because he never received an answer to his first step grievance(s).

Burke has a copy of his step one grievance, but not his step two grievance.  Burke never went to the warden with his smoking grievances.  He did not approach the warden to complain about not receiving a response to his ARP because Burke believed that it was a "joke," and that "they" would not respond anyway.  He also never wrote a grievance to the sheriff, only a letter complaining about smoking.  The sheriff did not really know what was going on at the MPDC.

There were designated smoking areas inside of the dormitories.  At the time of the hearing, the MPDC had just started enforcing the smoking policy.

Burke opened his own business at the MPDC and was buying cigarettes for $4 from the commissary and reselling them for $3.[2]  It was a means for him to make extra money.  He used to smoke about 13 years earlier.

At the hearing, Burke asked the court to subpoena MPDC surveillance videos from J Dormitory for July 15, 16, & 17, 2014.  Burke, however, is not housed in J dormitory.  He only went there to use the telephone.  At the time of the hearing, Burke was housed in administrative segregation.

Burke has received threats from other inmates for filing this lawsuit.  He wants to be moved to a state-owned and operated facility where they respect government smoking policies.  His alleged injuries from exposure to ETS include headaches, shortness of breath, and the smell of it.

3)   <u>Larry Cox</u>

Larry Cox is the Madison Parish Sheriff  – a position that he has held for the past 18 years.  As of January 1, 2014, LaSalle Mangement Co. is managing the parish jail.  The jail has a no smoking policy inside its buildings.  The inmates can buy cigarettes, but they have to smoke them outside of the buildings in the recreation yards.  The deputies are not supposed to smoke inside buildings either.

Cox confirmed that the Exhibit 2 reflects the jail's smoking policy.  If an inmate violates the smoking policy, then he is written up for it and disciplined as the deputies see fit.  In fact,

---

[2]  The court is not sure how Burke profited financially from this strategy.

write-ups are issued every day.

The jail has a written administrative remedy procedure.  It was in effect at the time Cox ran the jail and at the time of the hearing.  The procedure usually starts with a complaint to the captain.  If the inmate is unhappy with the captain's response, then he may proceed to step two, which is the major or warden.  If the inmate is dissatisfied with the warden's response, then it eventually escalates to the sheriff.  Some inmates have successfully exhausted the entire three step appeal process.

Cox has never ignored a letter from an inmate.  To his knowledge, however, he has never received a letter from Burke or Williams.  If he had received a letter, he would have taken action. Before the hearing, Cox went through two or three boxes full of inmate letters.  However, he did not discern any letters with Williams or Burke's names on them.

Whenever Cox goes into the prison dormitories he does not observe people smoking with clouds of smoke.  If he *did* observe someone smoking in the dormitory, he would call one of the deputies to handle the matter.

4)   Antonio Johnson

Johnson is a major working for LaSalle Management at the MPDC, where he has worked since 1994.  From 2012 until January 1, 2014, he served as acting warden, following the former warden's death.

Blank grievance forms are available in the control center of the inmate dormitories.  An inmate simply needs to approach the "flap" and request one.  Sometimes the facility is out of forms, but copies can be made and forwarded to the control room.  Once a grievance form is received, it is forwarded to the front office, which will pass the grievance on to Johnson.

Johnson will review the complaint and respond to it.  The deputy assigned to respond to the grievance will complete the response.

If the inmate is not satisfied with the response, he may request a warden's review.  The warden then will provide an answer.  If the inmate remains dissatisfied, the matter is elevated to the sheriff, or sometimes the DOC.

As acting warden, Johnson has received second step grievances.  It is his practice to answer the grievances, and sometimes just talk to the inmate.  Sometimes, they were able to come to a common agreement.  If still dissatisfied, then the inmate can take the matter to the sheriff.

Johnson did not recall receiving any grievances from Williams.  However, he did receive a letter concerning secondhand smoke from Williams' uncle.  Johnson called Williams' uncle, and advised him that smoking was not permitted in the dormitories.

Johnson also spoke to Williams about the matter.  Williams wanted a transfer to another place where there was no smoking at all.  Johnson advised Williams that he could not ship everyone to their facility of choice.  After the conversation, Williams never said anything to Johnson about smoking again.  To Johnson's knowledge, Williams never sent a third step grievance to the sheriff.  Johnson never saw the October and December letters that Williams purportedly submitted at step one.

Johnson saw that Burke wrote to a him and a captain about smoking.  Johnson discussed the matter with Burke, who informed him that he wanted a transfer to another facility.  Johnson advised Burke that smoking was prohibited inside of the buildings.  Johnson never spoke to Burke again.

8

If an officer observes an inmate smoking inside, the officer is supposed to write-up the inmate.  Johnson reviewed his files and confirmed that some inmates received write-ups for smoking.  Sometimes, however, the officer simply will admonish the inmate.

When asked whether he saw smoke in the dormitory at any time, Johnson replied, "No sir, not a big cloud of smoke, no."

Johnson researched Burke's commissary records and discovered that he bought tobacco products on a regular basis.

On January 22, 2013, Johnson went and checked the dormitories to see whether anyone was smoking inside.  However, he did not observe any smoke.  Johnson also sent Lester Turpin to keep a record of any smoke.

In addition, Johnson reviewed surveillance video from January 22, 2014, that depicts the dormitory where Williams was housed.  The dormitory houses close to 100 inmates.  Johnson did not observe any individuals smoking in the video.  He also did not see any clouds of smoke throughout the dormitory.  Furthermore, Johnson did not observe any smoking on the video of Burke's dormitory.  The videos are from different dates

Johnson hates cigarette smoke, and thus would discipline any individuals he observed smoking in the dormitory.

5)      Gerald McCloud

McCloud is a lieutenant employed by LaSalle Management.  He is a non-smoker and does not like cigarette smoke.  McCloud has not observed smoking in the dormitories.  However, he has seen officers issue write-ups to inmates.  McCloud would investigate any complaints of smoking.

Williams never complained to McCloud about secondhand tobacco smoke. Burke, however, told McCloud that he did not want to live in a population dormitory any longer. He wanted to be "shipped." To accommodate his request, McCloud moved Burke to administrative segregation. Burke, however, really wanted a transfer to another facility. Eventually, a trustee asked Burke if he wanted to move to Delta dormitory. Burke assented, and McCloud approved his reassignment to the new dormitory. Burke was in administrative segregation for less than one month. After Burke was reassigned to Delta dormitory, Burke never complained to McCloud again. To McCloud's knowledge, Burke never wrote to the sheriff complaining about secondhand tobacco smoke.

6)    <u>Michael Gordon</u>

Michael Gordon is an inmate at the MPDC, where he has resided since 2012, while serving his sentence on a 2003 second degree murder conviction. He stated that the MPDC did not have a smoking policy. However, two days before the hearing, the facility posted signs, and began to prohibit smoking in the dormitories. Within the past couple of days, inmates have received write-ups for smoking. The facility also only recently started allowing inmates to go into the yard to smoke. Before that, an inmate normally did not get to see the yard.

Gordon has observed Burke purchase cigarettes from the prison commissary and re-sell them. He has known Burke since he was a child. Gordon has observed Burke complain to the guards about an inmate smoking.

Gordon himself has filed many grievances complaining of smoke. However, he did not have any grievances with him because the guards had confiscated them. Gordon has not provided the guards with the names of inmates who smoke. A lot of inmates were smoking in

10

the dormitory on May 31, 2014.  The video from that date would confirm smoke in the dormitory.

7)   Toby Matt

Toby Matt is an inmate at the MPDC, where he has resided since November 2, 2011, while serving his sentence for a 2011 vehicular homicide conviction.  Matt stated that the facility is supposed to be non-smoking, but it sells cigarettes.  Moreover, inmates are permitted to smoke freely in the dormitories wherever they like – the bed area, television area.  The facility only recently installed no smoking signs.  If someone were to report a fellow-inmate for smoking, then he would be labeled a "rat," and beaten up.

Matt no longer smokes.  He recalled Williams filing an administrative grievance complaining about secondhand smoke.  He also remembered Williams writing a grievance two to three times over, complaining that he was a non-smoker, and wanting to be moved.  Williams did not use a formal grievance form because he was unable to obtain one.  Matt recalled Williams writing to Major Johnson.

In a dormitory with approximately 120 inmates, Matt estimated that perhaps 60 to 70 smoked at any given time.  Thus, the air in the dormitory stayed blue.  Matt said that the blue smoke may not be visible on video; rather, one has to visit the dormitory to view it personally. The non-smoking policy was posted on the wall when Matt arrived in 2011.  However, the facility has since added more signage.

8)   Zenus Fruge'

Zenus Fruge' is an inmate at the MPDC, where he has resided since December 13, 2011. He has convictions for attempted possession of a firearm by a convicted felon and for attempted

11

simple possession of illicit drugs. Fruge' testified that there was no smoking policy at the MPDC; everyone just smoked freely in the dormitories. The MPDC only recently started allowing inmates to go outside for an hour or so every couple of days. Before that, an inmate usually only went outside once every six months. Previously, the only way an inmate could receive permission to go outside for 45 minutes or so, was to bribe a guard with a cold drink.

Approximately two days before the hearing, the guards posted no-smoking signs, and started issuing write-ups for smoking . Before then, there were no placards in the dormitories.

If an inmate were to complain to a captain or lieutenant about another inmate smoking, then the reporting inmate would be "jumped," as soon as the guard departed. If a guard were to catch an inmate smoking, the guard would discipline the inmate. However, they tell the inmates "don't let us catch you smoking in the dorm . . . or put it out when we come in here . . . "

Fruge' observed Williams submit ARPs to Major Johnson on multiple occasions. However, the facility never answers anything.

Fruge' has known Williams since 2012. However, he never saw Burke before the hearing.

About 100 out of 120 people in C Dormitory were smokers. The surveillance video from May 2014 should confirm this. All of the ceilings are brown from cigarette smoke. One can smell the smoke throughout the dormitory. At any given time, probably ten inmates are smoking.

9)      Courtney Plumbar

Courtney Plumbar is an inmate at the MPDC, where he has resided since the first week of January 2013, while serving a sentence for a burglary conviction. Plumbar has never noticed any non-smoking signs in the facility until recently – less than one week earlier. Every day, at least

80 percent of the inmates in the dormitory smoke cigarettes.  At any given time about 70 percent

of them are smoking.  The cigarette smoke is unavoidable.  One can observe the tobacco residue

on the walls and ceilings.

Plumbar has written seven grievances, but never received a response.  He has known

Williams for the entire time that he has been in C dormitory - one year and seven months.  He

does not know Burke.  If an inmate were to report a fellow-inmate for smoking, he would be

labeled a "rat."

## II.      Hearing Exhibits

**Def. Exh. 1)**   MPDC Administrate Remedy Procedure

This eight page document is entitled "Administrative Remedy Procedure."  It specifies

that an offender may file a grievance under the Administrative Remedy Procedure when a policy,

condition, or incident at the facility personally affects the offender.  A grievance is defined, *inter

alia*, as a written a complaint by an offender or on the offender's behalf.  If a grievance is filed

against an employee, the employee may be the Step One respondent.  Written copies of the

procedure are to made available in the prison law library.  The policy also is to be posted in areas

where employees and offenders frequent.

At each step of the procedure, offenders will receive written answers.  Offenders also will

be provided directions for proceeding to the next step, with appropriate forms supplied for that

purpose.

The warden will screen every grievance before assigning it to a Step One respondent.  An

offender should attempt to resolve a problem without resorting to a grievance by discussing the

matter with prison employees.

The offender begins the procedure by completing a grievance and placing it in a box for that purpose.  Offenders who are in disciplinary or lock down status may hand the grievance to any employee.  Completed forms will be collected and delivered to the warden every day.  A grievance may be any written communication that contains the phrase "This is a grievance under the Administrative Remedy Procedure," or a completed standardized form provided by the sheriff.  No grievance will be rejected because it is not a standard form.  However, no written communication will be accepted as a grievance unless it contains the phrase, "This is a grievance under the Administrative Remedy Procedure."

At Step One of the procedure the offender must complete the grievance form and place it in the collection box for delivery to the warden within 30 days of the alleged incident.  The offender should keep a copy of his completed form for his own record.  The grievance will be screened and forwarded to the staff member who can best respond to the matter.  This staff member is the Step One Respondent.  The warden's office will let the offender know if his grievance is being processed or if it was rejected.   The Step One Respondent will respond to the offender within 15 days from the date that the completed grievance was referred to him by the warden.

An offender who is not satisfied with the Step One response may request a review by the warden by signing the bottom of the response to his grievance.  The Step Two grievance must be deposited in the collection box within five days from receipt of the offender's Step One response.  The warden shall ensure that the offender receives his "Review Decision of the Warden's Review Decision" in writing within 25 days after the warden receives the request for Step Two review.

An offender who remains dissatisfied with the results of the Step Two review may appeal to the sheriff by signing the bottom of the Warden's Review Decision.  Within five days of the date of the offender's receipt, the offender must deposit "Form 3" in the collection box.  A final decision will be made by the sheriff or his designee within 40 days after the sheriff receives the appeal.

All grievances must be processed from beginning until end within 90 days unless an extension of time has been granted.  If an offender has not received a response within the applicable time frame, then he may proceed to the next step in the Administrative Remedy Procedure.

The sheriff reserves the right to implement changes to enhance the grievance process. For instance, employees may be assigned to collect and deliver grievance and appeal forms each day, in lieu of collection boxes.

**Def. Exh. 2**   DOC Smoking Policy

The document is entitled, "Field Operations, Adult Institutions, Smoking Policy for Offenders," and is dated 13 February 2009.  It specifies that "[s]moking inside areas of every public building and place of employment operated by the Department, including contract and cooperative endeavor agreement work release programs is prohibited for all employees, visitors and offenders beginning August 15, 2009 . . ."  In addition, "no smoking" signs are to be posted in strategic areas.

**Def. Exh. 3**   Blank Inmate Grievance Forms

These documents include a blank grievance form, a blank response to grievance form, and a blank warden's review decision.  The forms contain instructions for completion and

submission of the forms.  Specifically, if the offender does not receive a response to his initial grievance within 30 days, then he may file a request for warden's review within five days thereafter.

**Def. Exh. 4**    Hand-written Grievances Signed by Lawrence Williams

The earliest document is entitled "Administrative Remedy Procedure," dated October 6, 2012, addressed to Captain Brook, and signed by Lawrence Williams.  In this hand-written letter, Williams complained of ETS exposure, officers supplying inmates with drugs and cell phones, the inability to accrue good-time credit, and corruption.

The second document (chronologically) is entitled "Administrative Remedy Procedure (ARP)," dated November 24, 2012, addressed to Major Johnson, and signed by Lawrence Williams.  In this document, Williams referenced his previous request to Captain Brooks, and again complained of exposure to ETS.  He requested an immediate transfer or threatened to file a § 1983 action against the facility.

The third document (chronologically) is entitled "Administrative Remedy Procedure," dated December 12, 2012, addressed to Major Johnson, and signed by Lawrence Williams.  In this missal, Williams documented that he still had not received a response from Johnson to his prior request.  Williams re-urged his ETS complaints, complained of breathing issues, requested a transfer, and threatened legal action.

**Def. Exh. 5)**    Voluntary Statement of Lester Turpin, dated January 22, 2014

This document is a handwritten statement completed by Lieutenant Lester Turpin in which he documented that he observed no smoke in C Dormitory from approximately 6:00 a.m. until 10:15 a.m. on January 22, 2014.  Although plaintiff(s) objected to the statement on the basis

of hearsay, defendant argued that the evidence was admissible pursuant to the business records exception.  The court need not exclude the evidence, however, because Turpin's four hour observation does not materially affect the court's resolution of the case.

**Def. Exh. 6)**     Commissary Records of Gilbert Burke

This exhibit is approximately 40 pages in length.  It reflects Burke's commissary purchases from May 2012 through December 20, 2013.  The invoices confirm Burke's frequent and regular purchase of tobacco ("Bugler Packs") and Camel cigarettes.

**Pl. Exh. 8)**     Inmate Grievance Forms Completed by Gilbert Burke

This exhibit reflects grievances completed by Gilbert Burke on official "Inmate Grievance Forms."  In the first form that is dated April 26, 2013, Burke asked to be moved to a non-smoking dormitory or a DOC facility because of his shortness of breath.  The "Warden Use Only" section of the form remained blank.

The second form is dated October 15, 2013, signed by Burke, and requested a transfer to Dixon or Hunt Correctional facilities.  The "Warden Use Only" section of the form was blank.

The third form is dated October 19, 2013, signed by Burke, and requested a transfer to DOC.  Burke complained that he had been trying to see a doctor for two weeks about his chest.

The fourth inmate grievance is dated June 11 and signed by Burke.  In this document, he complained of sleep deprivation because Lt. T. Johnson kept the lights on all night long.

In a document is entitled "Response to Grievance," Tavares Johnson replied to Burke that he kept the lights on for the safety of the inmates.

In a document entitled "Inmate Request Form," dated November 3, 2012, Burke complained that he had sent a grievance on October 15, 2012, complaining of chest pains.

17

**Def. Exh. 9)**   DVDs of Surveillance Video from the MPDC

This exhibit includes seven DVD discs containing video footage from the MPDC.  Some of the videos overlap.  The first video was taken on January 22, 2014, and included two five-minute clips from around 8:03 a.m.  The next video was taken on May 26, 2014.  It included a montage of footage from up to 32 cameras.  However, as many as 20 of the camera shots remain blank during the recorded period which lasts from 19:45 until 22:11.

Another disc captured footage from May 30, 2014.  It included video from up to 32 cameras mounted in various places at the MPDC.  As many as 20 of the camera views remain blank during the recording which extends from 06:14 until 07:21.

The next video captured footage from June 4, 2014.  It included video from up to 32 cameras mounted in various places at the MPDC.  As many as 20 of the camera views remain blank during the recording which extends from 9:14 until 11:11.

The last video captured footage from June 11, 2014.   It included video from up to 32 cameras mounted in various places at the MPDC.  As many as 20 of the camera views remain blank during the recording which extends from 8:15 until 8:21.

No clouds of cigarette smoke are visible in any of the footage.  In addition, the footage does not reveal anyone smoking.

**Pl. Exh. 10)**   Hand-Drawn Depiction of Dormitory

This exhibit is Burke's hand-drawn depiction of the dormitory.  It indicates that there are smoking areas in both corners of the area close to the rear exit.

**Def. Exh. 12)**  Deposition of Lawrence Williams

This exhibit is a 21 page transcript of Lawrence Williams' deposition that was taken on

18

January 22, 2014.

### Analysis and Resolution of Disputed Facts

"An evidentiary hearing consistent with *Flowers v. Phelps* amounts to a bench trial replete with credibility determinations and findings of fact." *Adkins v. Kaspar*, 393 F.3d 559, 563 (5th Cir. 2004) (citations and internal quotation marks omitted).  To establish an Eighth Amendment violation as a result of exposure to excessive levels of ETS, plaintiff must establish by a preponderance of the evidence that 1) objectively, he is "being exposed to *unreasonably high levels* of ETS . . ." and 2) prison authorities are deliberately indifferent to his plight - the subjective component.  *See Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001) (citing *Helling v. McKinney*, 509 U.S. 25, 33-35, 113 S.Ct. 2475, 2481-482 (1993)).

Exhaustion of administrative remedies is an affirmative defense; thus, the burden is on *defendant* to establish by a preponderance of the evidence that plaintiff failed to exhaust available administrative remedies.  *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (citation omitted).  "Preponderance" means that it is more likely so, than not so.  *Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1164 (5th Cir. 1993) (citation omitted).  It remains within the province of the finder of fact to weigh conflicting evidence and inferences and to determine the credibility of witnesses.  *See Yarrito v. Cook*, 1995 WL 17788756 (5th Cir. June 22, 1995) (unpubl.) (citation omitted).

At the close of the presentation of evidence on the issue of administrative exhaustion, and again at the close of all evidence, defendants petitioned the court for a "judgment as a matter of law."  In a bench trial, however, "the appropriate vehicle for dismissing a case as a matter of law at the close of plaintiff's evidence is a Rule 52(c) judgment on partial findings."  *Weber v.*

19

*Gainey's Concrete Products, Inc.*, 1998 WL 699047, *1 n1 (5th Cir. Sept. 21, 1998) (unpubl.)

(citation omitted).  Rule 52 provides, in pertinent part,

> **Judgment on Partial Findings**.  If a party has been fully heard on an issue during
> a nonjury trial and the court finds against the party on that issue, the court may
> enter judgment against the party on a claim or defense that, under the controlling
> law, can be maintained or defeated only with a favorable finding on that issue.
> The court may, however, decline to render any judgment until the close of the
> evidence. A judgment on partial findings must be supported by findings of fact
> and conclusions of law as required by Rule 52(a).

Fed.R.Civ.P. 52(c).

When deciding a case pursuant to Rule 52(c), the court is not required to make any special

inferences or construe the facts in the light most favorable to the plaintiff.  *Weber, supra*.

Moreover, "[a] judgment on partial findings may be entered by the court at any time it can

appropriately make a dispositive finding of fact on the evidence."  *Id*.

There is some question whether a Rule 52(c) motion is an appropriate vehicle to decide

the case when, as here, the movant enjoys the burden of proof as to the dispositive issue.  In this

case, however, some of plaintiff's witnesses offered testimony regarding the filing of grievances.

This evidence was introduced *after* defendant urged his initial motion for judgment on partial

findings.  Because this evidence is germane to the issue of administrative exhaustion and should

be considered, defendant's initial motion is improvident.  Furthermore, defendant's motion for

partial findings at the close of all the evidence serves no purpose and is superfluous.  In short,

defendant's motion is not well-taken.

**<u>Findings</u>**

I.     **Exhaustion of Administrative Remedies**

a)     <u>Law</u>

        Pursuant to 42 U.S.C. § 1997e, as amended by the Prison Litigation Reform Act

("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of

this title or any other Federal law by a prisoner confined in any jail, prison, or other correctional

facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

Exhaustion is mandatory, and is required even where the relief sought cannot be granted by the

administrative process.  *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S.Ct. 2378, 2382-83 (2006)

(citations omitted).  All "available" remedies must be exhausted, whether speedy and effective,

or not.  *Porter v. Nussle*,  534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002).  "Proper exhaustion

requires that the prisoner not only pursue all available avenues of relief but also comply with all

administrative deadlines and procedural rules."  *Johnson v. Kukua*, 342 Fed. Appx. 933, 934 (5th

Cir. 2009) (citing *Woodford, supra*).  An untimely or otherwise procedurally defective

administrative grievance does not satisfy the exhaustion requirement.  *Id.*

        "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong."  *Porter, supra* (citation omitted).  An inmate is required to

"exhaust his remedies, irrespective of the form of relief sought, injunctive or monetary."

*Richbourg v. Horton*, 2008 WL 5068680 (5th Cir. Dec. 2, 2008) (unpubl.) (citation omitted).

Exhaustion further applies to claims brought against defendants in their official and/or individual

capacities.  *See e.g., Williams v. Henagan*, 595 F.3d 610, 618 (5th Cir. 2010); *Hines v. Texas*, 76

21

Fed. Appx. 564 (5ᵗʰ Cir. Sept. 29, 2003) (unpubl.).

The Fifth Circuit has consistently held that an inmate's ignorance of a prison's grievance procedures does not excuse his noncompliance. *Aguirre v. Dyer*, 233 Fed. Appx. 365 (5ᵗʰ Cir. 2007) (citation omitted); *Simkins v. Bridges*, 350 Fed. Appx. 952, 953-954, (5ᵗʰ Cir. 2009) (citation omitted); *Plaisance v. Cain*, 374 Fed. Appx. 560, 561 (5ᵗʰ Cir. 2010) (citation omitted). Nonetheless, inmates should have "avenues for discovering the procedural rules governing their grievances." *Dillon v. Rogers*, 596 F.3d 260 (5ᵗʰ Cir. 2010) (citations omitted). When an inmate has no means of verifying the administrative grievance process, then misleading information by prison officials may make remedies unavailable. *Id*. "If impediments to filing grievances render remedies unavailable at one facility, remedies may become available again once a prisoner has been transferred, unless there are other problems at the new facility." *Dillon*, 596 F.3d at 267-268 (citing *Bryant v. Rich*, 530 F.3d 1368, 1379 (11th Cir.2008)). Stated another way, the grievance filing period is tolled only so long as the inmate is actually impeded from invoking and exhausting the process.

A prisoner is required to exhaust all steps of a grievance process even if the prison fails to respond to his grievances at an earlier step in the process. *Hicks v. Lingle*, 370 F. App'x 497, 499 (5th Cir. 2010); *Ates v. St. Tammany Parish*, Civ. Action No. 13-5732, 2014 WL 1457777 (E.D. La. Apr. 15, 2014). Moreover, to the extent that language on the form or policy regarding subsequent step review is phrased in discretionary rather than mandatory terms, the prisoner still must exhaust all "available" steps. *Ates, supra* (and cases cited therein). In short, the courts will not "will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Booth v. Churner*, 532 U.S. 731, 741, 121 S. Ct. 1819, 1825,

n. 6 (2001).

b)      The MPDC had an Available Administrative Remedy Procedure

The evidence establishes that the MPDC had a three step administrative remedy procedure in effect during the relevant period.  The first step requires an offender to complete a grievance form, or write a letter so identified, and place it in the collection box for delivery to the warden within 30 days of the alleged incident.  If an offender is dissatisfied with the Step One response, he may request a review by the warden by signing the bottom of the response to his grievance, and depositing it in the collection box within five days from receipt of the offender's Step One response.  Finally, an offender who is not content with the results of the Step Two review may appeal to the sheriff by signing the bottom of the Warden's Review Decision, and depositing it in the collection box.  If an offender does not receive a response within the applicable time frame, then he may proceed to the next step in the Administrative Remedy Procedure.

c)      Williams Failed to Exhaust All Available Administrative Remedies

The undersigned finds that defendant has established by a preponderance of the evidence that plaintiff did not exhaust all available administrative remedies.  At minimum, the court is compelled to find that plaintiff did not complete the third step of the grievance process.  Even if the court were to credit plaintiff's testimony that he submitted grievances to the captain and the warden, and that these submissions substantially complied with the first and second steps of the grievance process, defendant adduced uncontroverted evidence that the sheriff never received an appeal from Williams.  In fact, Williams admitted that he was unable to recall whether or not he appealed his grievance to the sheriff.  Furthermore, while Williams retained duplicate originals of

23

his submissions to Captain Brooks and Major Johnson, he did not adduce a copy of any

correspondence to the sheriff.

  Williams conceded that he was familiar with the grievance forms.  Moreover, he did not

allege that he was unable to uncover additional details regarding the administrative remedy

procedure, if needed.[3]

d)  <u>Remedy for Failure to Exhaust</u>

  The plain language of the PLRA precludes any further action on plaintiff's claims until he

has fully exhausted the administrative remedy procedure.[4]  Dismissal is the remedy, and it is

typically without prejudice.  *See e.g., Plaisance v. Cain, supra*; *Cooper v. Quarterman*, 342 Fed.

Appx. 12, 13 (5th Cir. 2009) (modifying dismissal for failure to exhaust to reflect that it was

without prejudice).  Because plaintiff failed to exhaust administrative remedies, the court cannot

reach the merits of his claim.  *Marshall v. Price*, 239 F.3d 365, 2000 WL 1741549 (5th Cir. Nov.

6, 2000) (unpubl.).[5]  Therefore, the court is unable to grant plaintiff the relief that he seeks (a

---

  [3]  Going forward, it may behoove the MPDC to institute some form of a computer log to track grievances and the facility's response(s).  It appears that some grievances may be slipping through the cracks and/or going unanswered.

  [4]  *See Wendell v. Asher*, 162 F.3d 887, 890-91 (5th Cir.1998) (overruled by implication on other grounds by *Jones v. Bock*, 549 U.S. 199, 214, 127 S. Ct. 910, 920 (2007) (§ 1997e(a) "plainly requires that administrative remedies be exhausted before the filing of a § 1983 suit, rather than while the action is pending . . . [t]o hold otherwise would encourage premature filing by potential litigants, thus undermining Congress' purpose in passing the PLRA, which was to provide the federal courts some relief from frivolous prisoner litigation.").

  [5]  Upon consideration of the report and recommendation, should the District Court determine that the plaintiff exhausted administrative remedies, the undersigned would find, *based on the evidence presented at this trial*, that plaintiff was exposed to excessive levels of ETS in dormitory at the MPDC.  In so finding, the undersigned credits the testimony of the plaintiff and his fellow-inmates.  Moreover, the tone of Antonio Johnson's response to the question of whether he observed clouds of smoke in the facility, suggested that, while there may

transfer and compensatory damages), as recently re-urged in his latest motion [doc. # 60].

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the motion for judgment on partial findings (incorrectly styled as a "motion for judgment as a matter of law") [doc. # 56] filed by defendant Antonio Johnson, be DENIED.

IT IS FURTHER RECOMMENDED that plaintiff Lawrence Williams' claims against defendant Antonio Johnson be DISMISSED, without prejudice for failure to exhaust administrative remedies.

IT IS FURTHER RECOMMENDED that plaintiff's motion for transfer and compensatory damages [doc. # 60] be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

---

not be *clouds* of smoke, there was some level of smoke present.  Furthermore, Johnson was aware of plaintiff's exposure to ETS.

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 23rd  day of September 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE